UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

Plaintiff,

v.                                                    Case No.: <u>24-cr-655-GHW-14</u>

JONATHAN ERIC GARDINER,

Defendant.

## <u>DEFENDANT JONATHAN ERIC GARDINER'S MEMORANDUM OF LAW IN SUPPORT OF RELEASE PENDING TRIAL</u>

### I.     PRELIMINARY STATEMENT

Defendant, Jonathan Eric Gardiner, a Bahamian National, respectfully submits this memorandum in support of his application for release pursuant to 18 U.S.C. § 3142.

### II.    FACTUAL AND PROCEDURAL HISTORY

This case presents unusual and extraordinary circumstances.  On May 12, 2026, national elections were being conducted throughout the Commonwealth of The Bahamas.

Mr. Gardiner was a passenger aboard a domestic Bahamian flight traveling between islands within The Bahamas. According to information presently available to the defense, passengers aboard the aircraft were engaged in election-related and campaign-related activities occurring on election day. The flight between Abaco and Grand Bahama typically takes 15-20 minutes.

Approximately 50 minutes after take off, the pilot reported difficulty with his navigation instruments and ultimately crashed in international waters off the coast of Florida.

Following the crash, Mr. Gardiner and the remaining occupants were rescued by United States personnel and transported to medical facilities for treatment.  At the time of the crash there was no arrest warrant for Mr. Gardiner in the United States or in any other country.  There was no complaint against him or any request from the United States for his extradition.

## A.    GOVERNMENT CONTROL FOLLOWING THE RESCUE

Following the rescue, Mr. Gardiner remained continuously under the supervision and control of federal authorities.

While hospitalized, armed Customs and Border Protection personnel maintained a continuous presence outside Mr. Gardiner's hospital room. His cellular telephone was confiscated, while other passengers from the aircraft were permitted to retain possession of their phones.  While he and the other passengers were released from the hospital within hours, there was a clear disparity between the treatment of the other passengers and Mr. Gardiner. After being taken to the Customs and Border Protection Office, the other passengers were taken to a hotel for the night while Mr. Gardiner was placed in a holding cell.  Prior to that, he was asked by Customs agents if he had anything to declare and he reported the Bahamian money he was carrying.  The following day, May 13th, the remaining passengers and the pilot departed back to the Bahamas with the help of Bahamian consulate personnel. Mr. Gardiner, however, was handcuffed and taken to a holding cell at Port Canaveral then to the Seminole County Jail and remained in custody.

According to information provided to the defense by United States Pretrial Services, Mr. Gardiner was subsequently paroled into the United States following the rescue operation.

2

Regardless of the precise immigration mechanism utilized, Mr. Gardiner did not voluntarily enter the United States. His presence in this country resulted directly from the aircraft crash, the rescue operation, and subsequent governmental decisions.

### B.    THE MIDDLE DISTRICT OF FLORIDA COMPLAINT

On May 14, 2026, the Government filed a criminal complaint in the United States District Court for the Middle District of Florida.

The complaint was sworn to by DEA Special Agent Michael Coleman, a New York-based DEA agent. The complaint alleged Mr. Gardiner's involvement in a narcotics investigation involving conduct purportedly occurring in the Northern District of Georgia beginning in 2022 or 2023.

The following day, May 15, 2026, the docket reflects Mr. Gardiner's formal arrest pursuant to the complaint.

### C.    THE CURRENCY RECOVERED FOLLOWING THE CRASH

The complaint alleges that Mr. Gardiner possessed approximately $30,000 in Bahamian currency and that the funds were located in a bag containing an envelope bearing the handwritten name of a Bahamian political figure identified as "Politician-1."

Agent Coleman further stated that, based upon his training and experience, the currency was packaged in a manner consistent with narcotics proceeds.

The complaint, however, omits significant contextual facts.

The defense expects the evidence to establish that only approximately $5,000 of the recovered currency was associated with the envelope bearing the politician's name.

Approximately $20,000 of the recovered currency had been withdrawn from Mr. Gardiner's business bank account on May 11, 2026, one day before the flight. Bank

3

records documenting that withdrawal are attached as Exhibit B. A photograph attached as Exhibit A reflects that those funds remained bundled and packaged by the banking institution.

The remaining funds consisted of campaign-related cash being transported on the day of a national election.

The Court should further consider that May 12, 2026 was the date of the Bahamian General Election. Exhibit C.

The defense further submits that The Bahamas does not maintain a comprehensive campaign-finance regulatory structure comparable to that found in the United States. Election-law authorities and election-monitoring organizations have noted the absence of statutory regulation governing political-electoral financing and campaign-funding disclosures. Exhibit D.

Consequently, the existence of Bahamian currency associated with political activity on election day is susceptible to explanations wholly unrelated to narcotics trafficking.

**D.    SUPERSEDING INDICTMENT**

The Government ultimately did not obtain an indictment against Mr. Gardiner in the Northern District of Georgia within the 30 day time period alloted by 18 U.S.C. 3161(b) (Speedy Trial Act). On the 31st day, June 13, 2026, the defense moved to dismiss the complaint against Mr. Gardiner.  That Motion has not been ruled upon, nor has the Government moved to dismiss the complaint. Subsequently, on June 16, 2026, in the absence of an indictment, Mr. Gardiner, through undersigned, petitioned the Court for a Writ of Habeas Corpus.  That motion was denied by Magistrate Judge Sarah L. Cave,

4

without prejudice on June 17, 2026.  On that same day, the Government filed a superseding indictment, adding him as a co-defendant on the instant case.  The facts sworn to in the Complaint did not form the basis for the Superseding Indictment.

Accordingly, the procedural history of this case is unusual. The complaint was filed in the Middle District of Florida, sworn to by a New York DEA agent, alleged conduct principally occurring in the Northern District of Georgia, and ultimately resulted in prosecution through superseding indictment in the Southern District of New York expanding the dates of the conspiracy from May 2021 through May 2026.

## III.   LEGAL STANDARD

The Bail Reform Act requires release subject to the least restrictive conditions that will reasonably assure appearance and community safety. 18 U.S.C. § 3142(c).

Even where a rebuttable presumption applies, the presumption shifts only the burden of production and does not relieve the Government of its burden of persuasion. Once rebutted, the presumption remains only one factor among many considered under § 3142(g).

## IV.   ARGUMENT

### MR. GARDINER HAS REBUTTED THE STATUTORY PRESUMPTION OF DETENTION

The Government may invoke the rebuttable presumption under 18 U.S.C. § 3142(e)(3), but the Second Circuit makes clear that a defendant's burden is limited and the burden of persuasion remains with the Government. *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991). A defendant need only produce some evidence that he is neither a danger nor an unmanageable flight risk. *Rodriguez*, 950 F.2d at 88.

Mr. Gardiner has met that burden. The allegations involve no violence, threats, or witness intimidation. His prior conviction is nearly twenty years old and does not suggest current dangerousness. His presence in the United States was not voluntary but resulted from a rescue following a domestic Bahamian flight crash. He has demonstrated a willingness to comply with strict supervision and agrees to conditions including GPS monitoring, surrender of travel documents, and any additional measures the Court deems appropriate.

These facts satisfy his burden of production and rebut the presumption, which then remains only one factor among many. *Rodriguez*, 950 F.2d at 88. The Government must still prove flight risk by a preponderance of the evidence and dangerousness by clear and convincing evidence—burdens it cannot meet here.

## V.    SECOND CIRCUIT AUTHORITY DEMONSTRATES THAT STRICT CONDITIONS CAN MITIGATE EVEN EXTRAORDINARY FLIGHT RISKS

The Second Circuit has consistently held that even defendants with significant resources, foreign citizenship, and international ties may be released under strict conditions. In *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007), the court approved release under rigorous measures despite substantial wealth and global mobility. Similarly, *United States v. Boustani*, 932 F.3d 79 (2d Cir. 2019), emphasized that detention must rest on an individualized assessment of whether conditions can reasonably assure appearance.

The relevant inquiry is not whether Mr. Gardiner presents some risk—many defendants in international narcotics cases do—but whether that risk can be managed. Here, it can. Mr. Gardiner does not possess vast financial resources, established ties to the

6

United States, or the infrastructure necessary to evade supervision. His presence in this country stems solely from a government rescue following an aviation accident, not from any effort to enter or remain here unlawfully. The stringent conditions he proposes provide substantial assurance of his appearance and mitigate any potential risk.

## VI.    DETENTION CANNOT BE BASED SOLELY UPON IMMIGRATION CONSEQUENCES

The Government may argue that Mr. Gardiner's immigration status warrants detention, but courts have rejected that position. In *United States v. Ventura*, No. 17 Cr. 418 (VEC), 2017 WL 5129012 (S.D.N.Y. Nov. 3, 2017), the court held that immigration status alone does not justify detention where release conditions satisfy the Bail Reform Act. Likewise, *United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167 (D. Or. 2012), found that immigration detention cannot override a release order.

The Bail Reform Act requires an individualized assessment of flight risk and dangerousness. Immigration status is only one factor and cannot substitute for the findings required by § 3142. A contrary rule would impose categorical detention on non-citizens, which Congress rejected. Mr. Gardiner's circumstances—particularly his involuntary presence in the United States and his willingness to comply with strict conditions—underscore why detention cannot be justified on this basis.  It is the understanding of the defense that Mr. Gardiner has been paroled into the United States after his detention and an immigration detainer has been lodged against him.

## VII.    CONCLUSION

For all of the foregoing reasons, Defendant Jonathan Eric Gardiner respectfully requests that the Court order his release pursuant to 18 U.S.C. § 3142 subject to such conditions as the Court deems appropriate.

## CERTIFICATE OF SERVICE

**IT IS HEREBY CERTIFIED** that a true and correct copy has been electronically filed with the Clerk of the Court utilizing the CM/ECF system on this 25th day of June 2026.

Respectfully submitted,

**SUSY RIBERO-AYALA, P.A.**
121 Alhambra Plaza
Suite 1500
Coral Gables, Florida   33134
Telephone:     (305) 854-4711
Facsimile:     (305) 489-8101

By:    /s/ *Susy Ribero-Ayala*
Susy Ribero-Ayala, Esquire
Florida Bar No.  993352
Sra@ralawmiami.com
*Attorney for Jonathan Eric Gardiner*

8