**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>JONATHAN ERIC GARDINER,<br><br>Defendant. | 24-cr-655-LJL (14)<br><br>**DEFENDANT'S MOTION FOR DISCLOSURE OF THE LEGAL BASIS FOR CONTINUED RETENTION OF SEIZED CURRENCY AND FOR APPROPRIATE RETURN-OF-PROPERTY RELIEF** |

Defendant Jonathan Eric Gardiner respectfully moves for an order directing the Government to identify the legal and factual basis for its continued retention of Bahamian currency taken following his May 12, 2026 rescue. He requests disclosure of any seizure warrant, restraint order, forfeiture notice, administrative forfeiture proceeding, inventory, or other authority under which the Government maintains custody. If no valid forfeiture restraint or continuing evidentiary justification exists, he requests appropriate relief to secure return of the currency, without prejudice to an application under Federal Rule of Criminal Procedure 41(g) in the district of seizure.

## BACKGROUND

The May 2026 device-warrant affidavit describes approximately B$30,000 in currency and associates the money with packaging bearing the name of "Politician-1." The defense disputes that characterization. A May 11, 2026 Bank of The Bahamas receipt documents a B$20,000 withdrawal from the Top Notch Builders Limited account, signed by Mr. Gardiner. Ex. A. At the June 25, 2026 hearing, the Government acknowledged that defense counsel had provided evidence of that withdrawal. June 25, 2026. Hr'g Tr. 16:21–23 (Ex. B). Only approximately B$5,000 was contained in the envelope labeled "Politician-1". The bank records and the actual packaging are material to the Government's asserted basis for retaining each identifiable portion of the currency.

The operative S2 indictment contains a general forfeiture allegation. Mr. Gardiner requests disclosure of the particular seizure, restraint, evidentiary, or forfeiture authority invoked to retain this currency and the documents establishing that authority.

## ARGUMENT

### I. THE GOVERNMENT SHOULD IDENTIFY THE BASIS AND STATUS OF ITS RETENTION

The Government should state whether the funds are held as evidence, under a criminal seizure or restraint order, for administrative or civil forfeiture, pursuant to an asserted criminal-forfeiture interest, or under some other authority. It should identify the custodian; the amount and denomination seized; the seizure date and location; any seizure and inventory records; the case or administrative number; and any notices, warrants, or orders authorizing retention. The May 11 banking record (Ex. A) and the June 25 transcript (Ex. B) warrant a particularized explanation rather than treating the approximately B$30,000 as an undifferentiated sum.

Second Circuit precedent requires meaningful accounting for seized property. In *Mora v. United States*, 955 F.2d 156, 158–59 (2d Cir. 1992), the court rejected the Government's failure to account adequately for property taken by federal agents and emphasized the importance of inventory and custody records. *See also, Rufu v. United States,* 20 F.3d 63, 65 (2d Cir. 1994), likewise required factual development when the record did not establish the disposition of seized items. Both decisions support requiring an identification of the custodial agency, the inventory, and the specific legal status of the Bahamian currency at issue here.

### II. GENERAL FORFEITURE NOTICE DOES NOT ITSELF RESOLVE THE STATUS OF THESE SPECIFIC FUNDS

Federal Rule of Criminal Procedure 32.2(a) governs notice of criminal forfeiture, and Rule 32.2(b)(1)(A) requires a determination of the requisite nexus when the Government seeks forfeiture of specific property. Fed. R. Crim. P. 32.2(a), (b)(1)(A). The documented B$20,000

business-account withdrawal and the distinct packaging of the seized funds warrant an individualized explanation of any claimed nexus between each portion of the currency and the charged offense.

Indeed, the Second Circuit has ordered a return of seized property where the Government failed to demonstrate the requisite nexus required by FRCP 32.2(b)(1)(A). *See United States v. Giovanelli,* 998 F.2d 116, 118–20 (2d Cir. 1993) (ordering the return of seized funds where the Government failed to establish an effective forfeiture and did not dispute the claimant's ownership). Although *Giovanelli* arose after criminal proceedings, it confirms that Government possession and an asserted forfeiture theory do not dispense with lawful process or the need to identify a legally sufficient basis for withholding property. Here, the contemporaneous bank withdrawal record (Ex. A) and the Government's acknowledgment of that record at the June 25 hearing (Ex. B) warrant particularized disclosure rather than a generalized characterization of all currency as criminal proceeds.

## III. THE GOVERNMENT SHOULD EXPLAIN ANY CONTINUING EVIDENTIARY NEED AND PRESERVE THE PROPERTY RECORD

If the Government retains the currency as evidence, it should identify the continuing evidentiary purpose served by possession of the original notes and produce the photographs, denomination and serial-number records, packaging records, seizure inventory, and chain-of-custody documentation. The Government should also identify the amount, denominations, original packaging, and present custodial agency for each separately seized group of currency, including the bank-banded portion documented in Exhibit A. Mr. Gardiner requests return of the currency subject to appropriate measures preserving its evidentiary characteristics.

*Mora*, 955 F.2d at 158–59, and *Rufu*, 20 F.3d at 65, further support an evidentiary record identifying what was seized, how it was inventoried, where it has been held, and what disposition has occurred. The defense requests the existing seizure and custody documentation and an

explanation of why the original bank-banded currency must remain in Government possession notwithstanding its ability to document denomination, serial numbers, packaging, and provenance.

### IV. THE DEFENSE PRESERVES RULE 41(g) RELIEF IN THE DISTRICT OF SEIZURE

Federal Rule of Criminal Procedure 41(g) directs that a motion for return of property be filed in the district where the property was seized. Fed. R. Crim. P. 41(g). Mr. Gardiner seeks disclosure and appropriate relief in this pending prosecution, including an order directing the Government to identify its retention authority. He expressly preserves his right to seek return under Rule 41(g) in the district of seizure in Florida.

The Second Circuit has recognized ancillary jurisdiction in the trial court over post-conviction property-return proceedings. *See Giovanelli*, 998 F.2d at 118; *Mora*, 955 F.2d at 158. Those decisions do not displace Rule 41(g)'s present district-of-seizure language for a pretrial return motion. This application therefore asks this Court to direct disclosure and address the status of property connected to its pending criminal prosecution, while preserving an application for return in the district of seizure as appropriate.

### V. ANY ASSERTED RESTRAINT OF ASSETS NEEDED FOR COUNSEL SHOULD BE IDENTIFIED PROMPTLY

If the Government asserts that the currency is restrained as forfeitable property and unavailable to retain counsel of choice, Mr. Gardiner requests disclosure of the asserted restraint and its legal basis. *United States v. Monsanto*, 924 F.2d 1186, 1195–98 (2d Cir. 1991) (en banc), and *United States v. Bonventre*, 720 F.3d 126, 131–32 (2d Cir. 2013), govern the availability of an adversarial hearing concerning such restrained assets. Mr. Gardiner preserves his request for relief under those authorities in a separate conditional motion.

*United States v. Monsanto,* 924 F.2d 1186, 1195–98 (2d Cir. 1991) *(en banc)* recognizes an adversarial hearing concerning the forfeitability of restrained assets needed to retain counsel.

Under *United States v. Bonventre*, 720 F.3d 126, 131–32 (2d Cir. 2013), the defendant must substantiate insufficient alternative unrestrained assets to fund counsel of choice; at the resulting hearing, the Government must demonstrate probable cause for the property's forfeitability. If the Government relies on such a restraint here, the defense seeks identification of its basis and preserves the separately requested conditional hearing.

## CONCLUSION

For these reasons, Mr. Gardiner respectfully requests that the Court order the Government to: (1) identify the legal basis and procedural status of its continued retention of each identifiable portion of the currency; (2) produce the seizure inventory, applicable warrants, restraint orders, forfeiture notices, and chain-of-custody documentation; (3) identify the present custodian and explain any continuing need to retain the original currency as evidence; and (4) confer regarding return of the seized funds and effectuate their return where appropriate. Mr. Gardiner further requests leave to supplement this motion following the Government's disclosures and such other relief as the Court deems just and proper. He expressly preserves his rights under Rule 41(g) in the district of seizure and under the authorities governing a conditional Monsanto hearing.

## CERTIFICATE OF SERVICE

**IT IS HEREBY CERTIFIED** that a true and correct copy has been electronically filed with the Clerk of the Court utilizing the CM/ECF system on this 16th day of October 2026.

Respectfully submitted,

**SUSY RIBERO-AYALA, P.A.**
121 Alhambra Plaza - Suite 1500
Coral Gables, Florida 33134
Telephone: (305) 854-4711
Facsimile: (305) 489-8101

By: /s/ *Susy Ribero-Ayala*
Susy Ribero-Ayala, Esquire
Florida Bar No. 993352
Sra@ralawmiami.com
*Attorney for Jonathan Eric Gardiner*

**EXHIBIT A — MAY 11, 2026 BANK OF THE BAHAMAS WITHDRAWAL RECEIPT**

Bank of The Bahamas Limited
John F Kennedy Drive Branch
Teller QORNELUS
BOB TIN 100116418

Cash Withdrawal
11-MAY-2026 11:24:45
Transaction Number: 166CWDL261310048
Customer TIN: 101720250

Account Name: TOP NOTCH BUILDERS LIMITED
Account Number: 1350004027
Account CCY: BSD
Paid To: 20*100
ID Type: DRIVERS LICENSE
ID No: 401119600

200x100

| | | |
|---|---|---|
| Withdrawal Amount | 20,000.00 | BSD |
| STAMP DUTY | 0.40 | BSD |
| IN HOUSE CASH WITHDRAWAL | 3.00 | BSD |
| VAT | 0.30 | BSD |
| In House Cash Withdrawal Fee | 100.00 | BSD |
| VAT | 10.00 | BSD |
| Total Withdrawal Amount | 20,113.71 | BSD |

BANK OF THE BAHAMAS LTD.
97 JOHN F KENNEDY DRIVE
MAY 11 2026

Customer Signature........
JONATHAN GARDINER

Jonathan Gardiner

## EXHIBIT B — JUNE 25, 2026 HEARING TRANSCRIPT, PAGES 12 AND 16–17



the complaint is set out by Agent Coleman, it describes cash in a bag, packaged in a way that is normal to drug dealers. I want to make clear to the Court that the cash found was Bahamian dollars. The complaint also suggests there was $30,000 in an envelope with a politician's name, there were $5,000 in an envelope with a politician's name, the rest had been bundled together by the bank because Mr. Gardiner withdrew it from the bank the day before, and I've provided receipts to your Honor in my submission.

Also important for the Court to know is the fact that in the Bahamas, there are no campaign finance laws. Contributions could be made in cash, expenses could be made in cash, and expenditures are not reported and don't need to be reported. So the characterization of the money which created part of the basis for the probable cause can be looked at either way. There is a reasonable explanation for that cash. There were no guns found on him, there were no drugs on the plane, nothing, no type of contraband was found.

Subsequent to that, I've gone through the whole process. He was jailed in several different institutions in the DEA office and at Port Canaveral, the cruise port, and subsequently in Seminole County, and Orange County.

The complaint seems to suggest a conspiracy out of Georgia, and then the indictment sets out an entirely different set of facts and expands the conspiracy from May 2021 to May

MS. MURRAY: I'm sorry. 15-year mandatory minimum.

THE COURT: Thank you. Please, proceed.

MS. MURRAY: As I mentioned the defendant has a history of using multiple aliases. He also has a lack of any ties to the United States, which defense counsel had put in her written motion last night. On the other side, he has very strong ties to other communities. Notably the Bahamas. He's a Bahamian citizen. We've alleged that he has strong connections with Bahamian officials. As Ms. Ribero-Ayala noted, he was, on the day he was involved in the plane crash, flying to make at least a $5,000, if not a $30,000 payment to politicians. He also has connections to Panama based on his prior federal conviction.

I would also note that in defense counsel's submission, she noted the Bahamian consulate member had sent a plane to pick up Mr. Gardiner and the other passengers after the plane crash and take them back to the Bahamas.

As I noted when we discussed the Pretrial Services report, the government strongly believes that the assets that are disclosed by the defendant are substantially undervaluing his access to assets to flee. He was arrested with $30,000 in bulk cash. Ms. Ribero-Ayala has provided evidence of $20,000 of that he had withdrawn the day prior. And that would represent, your Honor, almost the entire value of his net worth in cash as disclosed in the Pretrial Services report. And

defense counsel is saying that he was going to pay that to politicians. As your Honor may recall from the prior indictment in this case, some of the allegations in this case are the payment of bribes by the drug traffickers and by the conspiracy to Bahamian government officials for purposes of facilitating the drug trafficking.

Mr. Gardiner also has been associated with a company in the Bahamas called Top Notch Builders. It's a construction company. Back in 2017, he was listed as the president and director of that company. Subsequently, it appears that he has distanced himself from that company on paper, but there is still substantial evidence that he is the owner and the beneficial owner, despite sworn affidavits he had submitted that say that that's not the case. The government's current understanding is that Top Notch is operating through, effectively, shell entities.

Top Notch builders won an approximately $34 million government contract in 2017, and an additional $20 million supposed loan or line of credit has since been issued to Top Notch or its affiliates in connection with government contracts in the Bahamas. It's the government's position that Mr. Gardiner has profited substantially from those government contracts, continues to do so, has additional assets, including, for example, various airplanes that he holds in other people's names, but which he beneficially owns. So we